**UNITED STATES of America, Appellant,**

v.

**Jerome T. BLAND.**

**No. 71-1761.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 12, 1972.

Decided Sept. 6, 1972.

Rehearing Denied Dec. 20, 1972.

As Amended June 18, 19, 1973.

J. Skelly Wright, Circuit Judge, dissented and filed an opinion.

McGowan and Leventhal, Circuit Judges, filed separate statement as to why they voted to deny rehearing en banc.

J., Skelly Wright, Circuit Judge, filed separate statement, in which Bazelon, Chief Judge, and Spottswood W. Robinson, Circuit Judge, III, joined, as to why he voted to grant rehearing en banc.

Bazelon, Chief Judge, filed separate statement as to why he voted to grant rehearing en banc.

Wilkey, Circuit Judge, filed separate statement, in which Tamm, Circuit Judge, concurred, as to why he voted to deny rehearing en banc.

---

Miss Mary C. Lawton, Deputy Asst. Atty. Gen., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, John A. Terry, James E. Sharp, and Gregory C. Brady, Asst. U. S. Attys., were on the brief, for appellant. Mr. Harold H. Titus, Jr., present U. S. Atty., also entered an appearance for appellant.

Mr. Peter R. Kolker, Washington, D. C. (appointed by this court), for appellee.

Before WRIGHT and WILKEY, Circuit Judges, and RONALD N. DAVIES,* U. S. Senior District Judge for the District of North Dakota.

WILKEY, Circuit Judge:

The United States as statutory appellant seeks review of a memorandum opinion and order of the United States District Court for the District of Columbia, holding 16 D.C.Code § 2301(3)(A) unconstitutional as (1) an arbitrary legislative classification and (2) a negation of the presumption of innocence.[1] Section 2301(3)(A) provides:

> The term "child" means an individual who is under 18 years of age, except that the term "child" does not include an individual who is sixteen years of age or older and—
>
> > (A) charged by the United States Attorney with (i) murder, forcible rape, burglary in the first degree, robbery while armed, or assault with intent to commit any such offense, or (ii) an offense listed in clause (i) and any other offense

---

* Sitting by designation pursuant to 28 U.S. C. § 294(d) (1970).

1. United States v. Bland, 330 F.Supp. 34 (D.D.C. 1971).

properly joinable with such an offense. . . .[2]

The appellee, born 30 July 1954, had been indicted pursuant to Section 2301(3)(A) as an adult (he was sixteen at the time of his arrest and indictment) on charges of armed robbery of a post office and related offenses on 8 February 1971. Appellee moved below to dismiss the indictment for lack of jurisdiction, asserting that the statutory basis for prosecuting him as an adult was constitutionally deficient in that it failed to provide him with procedural due process. The District Court dismissed the indictment.[3]

## I. *The Legislative Background*

Congress, pursuant to its constitutional authority to exercise exclusive jurisdiction over the District of Columbia,[4] created the Family Division of the Superior Court of the District of Columbia.[5]

In defining the jurisdiction of the Family Division, Congress conferred on it exclusive jurisdiction of "proceedings in which a *child, as defined in section* 16–2301, is alleged to be delinquent, neglected, or in need of supervision."[6] Thus, the Family Division's jurisdiction extends over a person—a child—alleged to have committed delinquent acts, a child being classified as a person not having yet reached the chronological age of 18 and not charged by the United States Attorney with certain specified crimes listed in 16 D.C.Code § 2301. As to any other individual, either one who has reached 18 or who has reached the age of 16 and has been charged by the United States Attorney with one or more of the enumerated felonies,[7] he is not a child and is to be prosecuted in the regular adult court system, whether it be the D.C. Superior Court or the United States District Court.[8]

2. 16 D.C.Code § 2301(3)(A) (Supp. IV, 1971).

3. Subsequent to the District Court's opinion and order in the case at bar, other judges of the United States District Court for the District of Columbia have ruled on the same issue, the first six to the contrary: (1) United States v. Tatum (Crim. No. 1145–71; order entered 29 September 1971; Judge Jones); (2) United States v. Riley (Crim. No. 1510–71; order entered 4 October 1971; Judge Smith); (3) United States v. Alexander, 333 F.Supp. 1213 (D.C.D.C.1971) (Judge Gesell); (4) United States v. Dickey, et al. (Crim. No. 1448–71; order entered June 14, 1972; Judge Gasch); (5) United States v. Steele (Crim. No. 1085–71; order entered 27 Oct. 1971; Judge Corcoran); (6) United States v. Reginald Barden (Crim. No. 271–72; order entered 16 March 1972; Judge Flannery); (7) United States v. McIlwain (Crim. No. 1178–71; order entered 10 May 1972; Judge Bryant); (8) United States v. Maurice L. Johnson (Crim. No. 2198–71; order entered May 10, 1972; Judge Bryant); and (9) United States v. Andrew E. Morgan (Crim. No. 850–71; order entered May 10, 1972; Judge Bryant).

4. U.S.Const. art. I, § 8, cl. 17.

5. 11 D.C.Code § 1101(13) (Supp. IV, 1971).

6. *Id.*, at § 1101(13) (emphasis supplied).

7. 16 D.C.Code § 2301(3) also provides:
 (3) The term "child" means an individual who is under 18 years of age, except that the term "child" does not include an individual who is sixteen years of age or older and—
 * * * * *
 (B) charged with an offense referred to in subparagraph (A)(i) and convicted by plea or verdict of a lesser included offense; or
 (C) charged with a traffic offense. For purposes of this subchapter the term "child" also includes a person under the age of twenty-one who is charged with an offense referred to in subparagraph (A)(i) or (C) committed before he attained the age of sixteen, or a delinquent act committed before he attained the age of eighteen.

8. There is a transition in progress involving the criminal jurisdiction of each court as a result of the enactment of the District of Columbia Court Reform and Criminal Procedure Act of 1970. Pub.L. 91–358, 84 Stat. 473, 29 July 1970. After 1 August 1972, all adult criminal offenses under the D.C.Code will be prosecuted in the new Superior Court, 11 D.C. Code § 923 (Supp. IV, 1971), and all adult U.S.Code offenses will be prosecuted in the United States District Court, 11 D.C.Code § 502 (Supp. IV, 1971). Where a defendant is charged with viola-

The legislative history accompanying 16 D.C.Code § 2301 reveals Congress' intent in enacting this legislation: To improve the operation of the juvenile justice system in the District of Columbia by removing from its jurisdiction certain individuals between the ages of 16 and 18 whom Congress concluded (1) were beyond rehabilitation in the juvenile justice system, and (2) whose presence in that system served as a negative influence on other juveniles. This represents a policy judgment of Congress, after gathering extensive appropriate evidence, as to how persons should be classified as "adult" and "child" for the purposes of rehabilitation following the commission of a criminal offense. We note that the policy judgment was both negative and positive: some previously classified as juveniles were beyond rehabilitation; others of the same chronological age were susceptible to special juvenile treatment, and for any chance of success these latter should be protected against the hard-core repeat offenders of the same chronological age.

While Congress easily could have established 16 as the age cutoff date (it is not clear what constitutional infirmities our dissenting colleague would have found in that less sympathetic approach), it concluded that some within the 16–18 age bracket were susceptible of rehabilitation, and determined that those age 16 and 17 whose offenses charged were minor were to be included within the juvenile system. As the Department of Justice made clear in its Memorandum to the Senate Committee:

The jurisdictional age for all juveniles was not lowered to 16 because there are still first offenders charged with minor offenses who may benefit from juvenile treatment up to the age of 18, and treating them as adults may be harsh and unnecessary. At the same time, experience has shown that in certain crime categories, juvenile treatment is unworkable. Accordingly, the jurisdictional age has been lowered with respect to these crimes.[9]

Under the initial Senate version of Section 2301, the jurisdiction of the Family Division

extends, in general, to persons under the age of 18. Excluded from the latter class, however, is any person 16 years of age or older in any case (1) where such person is formerly [sic] charged with the commission of one or more of certain enumerated grave offenses, and (2) where such persons has [sic] previously had the benefit of special juvenile disposition after being charged with serious misconduct committed after attaining the age of 15.[10]

The Senate Committee on the District of Columbia, in revealing its rationale for excluding such persons from the jurisdiction of the Family Division, stated:

The Committee has concluded that a juvenile can reliably be considered too well formed or sophisticated for, and beyond the reach of, mere juvenile therapy if the particular juvenile has already been exposed, in years of relative discretion, to the juvenile system and treated to the extent that his case required (as suggested by a prior finding of delinquency), and has nevertheless returned to serious misconduct (as suggested by a serious felony charge).[11]

___

tions of both the D.C. and U.S.Codes, he will be prosecuted in the United States District Court, 11 D.C.Code § 502(3) (Supp. IV, 1971). *See also* note 3, *supra*, United States v. Alexander, 333 F. Supp., at 1214–1215.

9. U.S. Dept. of Justice Staff Memorandum on Proposed Code of Juvenile Procedure for the District of Columbia (S. 2981) (1969), printed in "Crime in the National

Capital," Hearings Before the Senate Committee on the District of Columbia on S. 2981, Juvenile Court Proceedings, 91st Cong., 1st Sess. pt. 7, at 1816 (1969).

10. S.Rep. No. 620, 91st Cong., 1st Sess. 8 (1969).

11. *Id.*, at 8–9. The Committee also noted, however: "Conversely, the committee did not take so dim a view of juveniles in the

The initial House version of Section 2301 provided that "a person, 16 years of age or older, who is charged by the United States attorney with an enumerated violent crime [a more extensive list than contained in the initial Senate version] is automatically subject to the jurisdiction of the adult court." [12] The House Committee on the District of Columbia, referring to the same statistics on serious offenses committed by juveniles and to the growing recidivist rate among this group cited by the Senate Committee,[13] gave the following as the basis for its exclusion of those 16 years of age or older charged with a certain serious crime from the Family Division's jurisdiction:

> Because of the great increase in the number of serious felonies committed by juveniles and because of the substantial difficulties in transferring juvenile offenders charged with serious felonies to the jurisdiction of the adult court under present law, provisions are made in this subchapter for a better mechanism for separation of the violent youthful offender and recidivist from the rest of the juvenile community.[14]

As finally enacted, Section 2301 reflects a compromise between the initial Senate and House versions. It provides that the Family Division shall have jurisdiction over "persons under 18 except those 16 and older charged by the United States attorney with murder, forcible rape, robbery while armed, burglary in the first degree, or assault with intent to commit one of these offenses, or any such offense and a properly joinable offense." [15] As such, it eliminates the previous finding of delinquency required under the initial Senate version and shortens the list of serious crimes contained in the initial House version.

## II. *The Due Process and Equal Protection of the Law Issue*

The District Court found Section 2301(3)(A) invalid as violative of due process of law:

> The determination that a child should be tried as an adult cannot be made without the safeguard of basic due process. Without a provision in the new statute that would require some determination, reached after a fair hearing, that an individual is beyond the help of the Family Division, that statute must fall as violative of due process.[16]

To the Government's objection below that the statute specifically classifies those individuals who are at least 16 years of age and charged with certain enumerated crimes by the United States Attorney as exempt from the Family Division's jurisdiction, the District Court found no standards in the statute to guide the United States Attorney in making this determination, hence it held that the statute denies due process to those individuals so charged.

### A.

█ In relation to this holding of the District Court, we note in the first place that legislative classifications are entitled to a strong presumption of validity

---

16- to 18-year old age group generally as to presume sophistication in every case involving serious misconduct—and especially in cases involving first offenders or where any previous offense was committed before the onset of a relatively significant degree of discretion." *Id.*, at 9. As such, "[t]he committee was not inclined, therefore, to approve a lowering of the jurisdictional age limit (for the Family Division) in simple reaction to statistic indicating a greater incidence of crime committed by juveniles aged 16 to 18." *Id.*, at 8.

12. H.R. Rep. No. 907, 91st Cong., 2d Sess. 50 (1970).

13. *Id.*, at 48–49. The alarm felt by the House Committee as a result of its investigation is nowhere better set forth than in the portion of the Committee Report quoted by our dissenting colleague, footnote 3.

14. *Id.*, at 50.

15. H.R. Rep. 1303, 91st Cong., 2d Sess. 226 (1970).

16. See note 1, *supra*, at 38.

and may be "set aside only if no grounds can be conceived to justify them." [17] As the Supreme Court has long held:

> It is a salutary principle of judicial decision, long emphasized and followed by this Court, that the burden of establishing the unconstitutionality of a statute rests on him who assails it, and that courts may not declare a legislative discrimination invalid unless, viewed in the light of facts made known or generally assumed, it is of such a character as to preclude the assumption that the classification rests upon some rational basis within the knowledge and experience of the legislators. [18]

As the discussion on the legislative background of Section 2301(3)(A), *supra*, indicates, Congress was well acquainted with the problems confronting the juvenile justice system in the District of Columbia; logically its definition of the Family Division's jurisdiction reflects its particular concern with the rise in the number of serious crimes committed by those 16 years of age and over coupled with the growing recidivist rate among this group.

Secondly, legislative exclusion of individuals charged with certain specified crimes from the jurisdiction of the juvenile justice system is not unusual. The Federal Juvenile Delinquency Act excludes offenses which are punishable by death or life imprisonment. Several states have similarly excluded certain crimes in defining the jurisdiction of their respective systems of juvenile justice, [19] while others vest concurrent jurisdiction over enumerated crimes in both their adult and juvenile courts. [20] Finally, the United States District Court for the District of Maryland, upheld by the Fourth Circuit, while it did find a geographic age distinction in the jurisdiction of the Maryland Juvenile Court violative of due process, found no difficulties with the exclusion of those 14 years of age and over charged with capital crimes from juvenile jurisdiction. [21]

**B.**

The disagreement of our dissenting colleague arises almost solely from his fundamental unwillingness to accept Congress' power to define what is a "child." The words "child," "infant," and "minor" from early times in various legal systems have been susceptible to definition by statute; the critical "age" for specified purposes has varied, and differed between male and female. See

17. McDonald v. Board of Election Com'rs, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969), and cases cited.

18. Metropolitan Casualty Insurance Co. v. Brownell, 294 U.S. 580, 584, 55 S.Ct. 538, 540, 79 L.Ed. 1070 (1935) (footnote omitted).

19. Colo.Rev.Stat., §§ 22–1–3(17)(b), 22–1–4(4)(b); 10 Del.Code Ann. § 957, 11 Del. Code Ann. §§ 360(b), 363(d), 468A; Burns' Ind.Stat. §§ 9–3204(1), 9–3213, IC 1971, 31–5–7–4, 31–5–7–13; Iowa Code Ann. § 232.64; La. Const., art. 7, § 52; Md. Code Ann., art. 26, § 70–2(d) (1); Miss. Code Ann. § 7185–15; Nev. Rev.Stat. § 62.050; S.C. Const., art. 5, § 1; and Tenn. Code Ann. § 37–265.

Challenges to these provisions as violative of due process and equal protection of the law have not prevailed. *See* State v. Ayers, Del., 260 A.2d 162 (1969), in which the court rejected a Fourteenth Amendment challenge to 11 Del. Code Ann. § 363(d) (an anti-riot statute), which provided that those over sixteen years of age and charged with violating this statute were to be tried as adults. *See also*, to the same effect, Prevatte v. Director, 5 Md.App. 406, 248 A.2d 170 (1968), and Davis v. State, Miss., 204 So.2d 270, rev'd on other grounds, 394 U. S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969).

20. 37 Ill.Ann.Stat. § 702–7(3), upheld in People v. Carlson, 108 Ill.App.2d 463, 247 N.E.2d 919 (1969). *See also* DeBacker v. Sigler, 185 Neb. 352, 175 N.W.2d 912 (1970), and Mayne v. Turner, 24 Utah 2d 195, 468 P.2d 369 (1970), sustaining concurrent jurisdiction in their respective adult and juvenile courts over certain enumerated offenses.

21. Long v. Robinson, 316 F.Supp. 22 (D. Md.), aff'd 436 F.2d 1116 (4th Cir. 1971).

Bouvier's Law Dictionary; Black's Law Dictionary. Before 1970 the District of Columbia Code (16 D.C.Code § 2301 (1967)), defined "child" as "a person under 18 years of age." Our dissenting colleague seems to consider this statute and its definition immutable, apparently because it was involved in Kent v. United States; [22] we accept the fact that Congress has abolished this statutory definition and by statute substituted another, to which we simply give full effect.

We think the position of the appellee here would have more validity if it were possible to read (as apparently the dissenting opinion does) the word "child" as "child (as defined in the previous and now repealed statute)," but of course this is absurd. Yet it is necessary that the meaning of "child" be as defined in the repealed statute for the legal position of the appellee to be sustained. Believing that Congress has power to amend a statutory definition, we start with the definition of "child" currently on the statute books, and reach the legal conclusions set forth herein.

■ Similarly, the appellee's argument on an alleged "waiver" of the jurisdiction of the Family Court is based on the now outmoded definition. The District of Columbia Code states clearly that the jurisdiction of the Family Division of the Superior Court in delinquency cases is limited to those who come within the statutory definition of "child." 11 D.C.Code § 1101 provides:

> The Family Division of the Superior Court shall be assigned, in accordance with chapter 9, exclusive jurisdiction of—
>
> (13) proceedings in which a *child, as defined in* 16–2301, is alleged to be a delinquent. . . . (Emphasis supplied.)

Until it is determined whether a person is a "child" within the statutory definition, there is no jurisdiction; therefore, *a fortiori* there can be no waiver of jurisdiction.

Nor is it true "a suspected juvenile remains a child until he is charged with an enumerated offense by the United States Attorney." There is just no classification of the person as a child or an adult until (1) his age is accurately ascertained, and (2) the decision on prosecution is made. Congress has incorporated more than one element in the definition of a "child." Until all the elements of the definition are ascertained, the status of the person is simply uncertain, just as under the 1967 definition the status of a person would be uncertain until his true age was established.

### C.

■ The District Court's finding in the case at bar, and appellee's assertion to the same effect—that the exercise of the discretion vested by Section 2301(3)(A) in the United States Attorney to charge a person 16 years of age or older with certain enumerated offenses, thereby initiating that person's prosecution as an adult, violates due process—ignores the long and widely accepted concept of prosecutorial discretion, which derives from the constitutional principle of separation of powers. The Fifth Circuit, in holding that a court had no power to compel a United States Attorney to sign an indictment, stated:

> Although as a member of the bar, the attorney for the United States is an officer of the court, he is nevertheless an executive official of the Government, and it is as an officer of the executive department that he exercises a discretion as to whether or not there shall be prosecution in a particular case. It follows, as an incident of the constitutional separation of powers, that the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the

22. 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966).

United States in their control over criminal prosecutions.[23]

■ While there may be circumstances in which courts would be entitled to review the exercise of prosecutorial discretion, these circumstances would necessarily include the deliberate presence of such factors as "race, religion, or other arbitrary classification," not found in the case at bar.[24] For example, in the absence of such factors, this court has held that the exercise of prosecutorial discretion, even when it results in different treatment of codefendants originally charged in the same case with the same offense, does not violate due process or equal protection of the law.[25]

■ The District Court and appellee in the case at bar point to the acknowledged significant effect of the United States Attorney's decision whether to charge an individual 16 years of age or older with certain enumerated offenses, and conclude that, in the absence of a hearing, due process is violated when such a decision is made. This, however, overlooks the significance of a variety of other common prosecutorial decisions, e. g., whether to charge one person but not another possible codefendant; whether to charge an individual with a misdemeanor or a felony; etc.[26] Furthermore, the decision whether to charge an individual with a misdemeanor or a felo-

23. United States v. Cox, 342 F.2d 167, 171 (5th Cir.), cert. denied, Cox v. Hauberg, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965) (footnote omitted). *See also* Powell v. Katzenbach, 123 U.S.App.D. C. 250, 359 F.2d 234, cert. denied, 384 U.S. 906, 86 S.Ct. 1341, 16 L.Ed.2d 359 (1966), and Newman v. United States, 127 U.S.App.D.C. 263, 382 F.2d 479 (1967). In the latter this court stated: Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought. 127 U.S.App.D.C. at 264, 382 F.2d at 480. *See also* Hutcherson v. United States, 120 U.S.App.D.C. 274, 345 F.2d 964, cert. denied, 382 U.S. 894, 86 S.Ct. 188, 15 L.Ed.2d 151 (1965).

24. As the Supreme Court suggested in Oyler v. Boles, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962): Moreover, the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it is not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification. Therefore grounds supporting a finding of a denial of equal protection were not alleged. 368 U.S., at 456, 82 S.Ct. at 506. *See also* Washington v. United States, 130 U.S.App.D.C. 374, 401 F.2d 915 (1968), and United States v. CCO, 428 F.2d 264 (9th Cir.), cert. denied, 400 U.S. 903, 91 S.Ct. 141, 27 L.Ed.2d 140 (1970).

25. See note 23, *supra*, Newman v. United States. In a more recent case, this court stressed the extent of legitimate prosecutorial discretion, even in the context of a case in which the trial judge believed a clear abuse of such discretion was involved. United States v. Gainey, 142 U.S. App.D.C. 262, 440 F.2d 290 (1971).

26. Appellee's attempt to equate the United States Attorney's decision in the case at bar with the transfer of an individual from the jurisdiction of the juvenile court to that of adult court is unavailing. In contrast to such a situation, the case at bar involves *no* initial juvenile court jurisdiction; the United States Attorney's decision to charge an individual sixteen years of age or older with certain enumerated offenses operates automatically to exclude that individual from the jurisdiction of the Family Division. The cases cited by the appellee are equally inapposite: In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), did not involve the question of adult court jurisdiction over persons sixteen years of age or over; Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), Haziel v. United States, 131 U.S.App. D.C. 298, 404 F.2d 1275 (1968), and Black v. United States, 122 U.S.App.D.C. 393, 355 F.2d 104 (1965), all involved the "full investigation" requirement of 11 D.C. Code § 1553 (1967), the former local juvenile statute. Under former Section 1553, individual judgments were to be made by the Juvenile Court as to whether a particular youth should be "waived" for trial as an adult. The comparable transfer provision of the revised juvenile statute, 16 D.C. Code § 2307 (Supp. IV, 1971), is not at issue in the case at bar, which involves determination of which ju-

ny has long determined the court in which that person will be tried.[27] We cannot accept the hitherto unaccepted argument that due process requires an adversary hearing before the prosecutor can exercise his age-old function of deciding what charge to bring against whom. Grave consequences have always flowed from this, but never has a hearing been required.

While the Supreme Court was presented with the precise question raised by this appeal on an earlier occasion, it declined to rule on the question because of "the barrenness of the record on this issue," including the failure of the Nebraska Supreme Court to pass on it, and the fact that "[s]o far as we have been made aware, this issue does not draw into question the validity of any Nebraska statute." [28] The Federal Juvenile Delinquency Act, however, presents an analogous situation on which courts have passed judgment. Section 5032 of the Act provides in relevant part:

A juvenile alleged to have committed one or more acts in violation of a law of the United States not punishable by death or life imprisonment, and not surrendered to the authorities of a state, shall be proceeded against as a juvenile delinquent if he consents to such procedure, unless the Attorney General, in his discretion, has expressly directed otherwise.[29]

The discretion provided the Attorney General under this section can, of course, result in vastly different consequences for an individual subject to the Act since commitment of a juvenile ad-

judicated delinquent may continue under the Act,[30] as under the comparable provision of the D.C.Code,[31] only for the remainder of the youth's minority. Despite the significance of this decision, Judge Weinfeld of the District Court for the Southern District of New York stated:

. . . under this section [§ 5032], which requires the juvenile's consent to such proceeding, the ultimate decision as to whether the Government will forego prosecution under the general criminal statutes rests in the sole discretion of the Attorney General. The Assistant Attorney General, who is authorized to exercise the Attorney General's discretion, has directed that this defendant be prosecuted under regular adult criminal procedures. The Court is without power to interfere with or overrule the exercise of this discretion.[32]

As such, judicial consideration of the legitimate scope of prosecutorial discretion clearly encompasses the exercise of such discretion where it has the effect of determining whether a person will be charged as a juvenile or as an adult. In the absence of such "suspect" factors as "race, religion, or other arbitrary classification," the exercise of discretion by the United States Attorney in the case at bar involves no violation of due process or equal protection of the law.

### III. *The Presumption of Innocence Issue*

The District Court and appellee assert that the exercise of discretion by

---

risdiction—adult or juvenile—attaches to appellee in the first instance. As such, it cannot involve a transfer from a non-existent juvenile jurisdiction to adult court.

27. Also, since 1 February 1971 in the District of Columbia, the decision of *which* felony to charge has similarly determined the court having jurisdiction. 11 D.C. Code §§ 502, 923 (Supp. IV, 1971).

28. DeBacker v. Brainard, 396 U.S. 28, 32, 90 S.Ct. 163, 165, 24 L.Ed.2d 148 (1969), in which the Supreme Court dismissed the grant of certiorari as "improvidently

granted." *Id.*, at 33, 90 S.Ct. 163. In a subsequent case, the Nebraska Supreme Court considered the same question and found the exercise of such discretion did not violate due process. See note 20, *supra*, DeBacker v. Sigler.

29. See 18 U.S.C. § 5032 (1970).

30. *Id.*, at § 5034.

31. 16 D.C. Code § 2322(f).

32. United States v. Verra, 203 F.Supp. 87, 91 (S.D.N.Y.1962) (footnote omitted); *accord*, Ramirez v. United States, 238 F. Supp. 763, 764 (S.D.N.Y. 1965).

the United States Attorney under Section 2301(3)(A) violates due process in that it denies the individual charged the presumption of innocence.

This, however, mistakes the nature of the United States Attorney's decision in the case at bar to charge appellee with an offense enumerated in Section 2301(3)(A). While the decision does have the effect of determining whether appellee is to be tried as an adult or a juvenile, it is not a judgment of guilt or an imposition of penalty. On the contrary, it is simply the result of a determination by the United States Attorney that there is sufficient evidence to warrant prosecution of the appellee for the offense charged and that adult prosecution is appropriate. It in no manner relieves the Government of its obligation to prove appellee's guilt beyond a reasonable doubt.[33] Nor does it remove appellee's right to a jury trial. As the subsequent opinion of District Judge Gesell, ruling on this same issue under this statute, recognized:

> It should be noted that all the traditional protections of grand jury presentment, preliminary hearing and jury trial are afforded this group of [alleged] offenders and that in the event of convictions the extraordinarily flexible provisions of the Federal Youth Correction Act designed to create programs for limited incarceration and effective rehabilitation are completely available.[34]

The presumption of innocence, as the Supreme Court has long held, applies to the prosecution at trial and " . . . is a conclusion drawn by the law in favor of the citizen, by virtue whereof, *when brought to trial* upon a criminal charge, he must be acquitted, unless he is proven [beyond a reasonable doubt] to be guilty." [35] As such, the District Court's opinion below and appellee's reliance on, *inter alia*, Goldberg v. Kelly [36] and Jones v. Robinson [37] is mistaken; in contrast to the summary adjudications found wanting in those cases, the United States Attorney's decision in the case at bar marks only the beginning of the process of adjudication of appellee's guilt, a process marked by the presence of all the traditional protections or procedural due process, followed by the extraordinarily liberal rehabilitation provisions of the Federal Youth Corrections Act.

## IV. *Conclusion*

 For these reasons, the order of the District Court dismissing appellee's indictment, on the basis of its opinion holding 16 D.C.Code § 2301(3)(A) unconstitutional as an arbitrary legislative classification and as a negation of the presumption of innocence, is accordingly reversed and the case remanded for trial.

Reversed and remanded.

J. SKELLY WRIGHT, Circuit Judge, dissenting:

As a matter of abstract legal analysis, the opinion of my brethren might appear to some degree persuasive. But we do not sit to decide questions in the abstract, and we are not writing on a clean slate. In 1966 the Supreme Court spoke clearly and specifically about this area.

---

33. Holt v. United States, 218 U.S. 245, 253, 31 S.Ct. 2, 54 L.Ed. 1021 (1910).

34. See note 3, *supra*, United States v. Alexander, 333 F.Supp., at 1217.

35. Coffin v. United States, 156 U.S. 432, 458, 15 S.Ct. 394, 404, 39 L.Ed. 481 (1895).

36. 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), which involved the cutting off of welfare funds without adequate notice and a prior hearing at which the welfare recipient could have the assistance of counsel and where the decision-maker *did not state his reasons or the evidence* upon which he based his decision.

37. 142 U.S.App.D.C. 221, 440 F.2d 249 (1971), applying the requirement of, *inter alia*, a hearing enunciated by Goldberg v. Kelly, note 36, *supra*, to the decision to transfer a patient accused of a crime to the maximum security section of St. Elizabeths Hospital.

*See* Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). It held, in unmistakable terms, that before a child under 18 can be tried in adult court the Constitution requires a hearing "sufficient in the particular circumstances to satisfy the basic requirements of due process and fairness * * *." *Id.* at 553, 86 S.Ct. at 1053.[1] I had not supposed that it was within our power as a lower federal court to change this mandate. Nor had I imagined that Congress could "overrule" this constitutional decision by a simple statutory enactment. Yet the majority holds that whereas before passage of the Court Reform Act of 1970 the Constitution required a hearing, after its passage the Constitution requires no such thing. While I must confess that this display of judicial legerdemain leaves me properly dazzled and mystified, I cannot quite persuade myself that the rabbit has really emerged from the hat. I would therefore hold that appellee is entitled to a hearing with counsel and a statement of reasons before he can be charged and tried as an adult.

## I

From the majority's discussion of the statute's legislative history, one might assume that the definition of "child" in 16 D.C.Code § 2301(3)(A) (Supp. V. 1972) has remained unchanged from earliest times or that the story of how it took its present form is uninteresting and irrelevant. In fact, 16 D.C.Code § 2301(3)(A) is a fairly recent addition to the Code and its legislative history has a direct bearing on the proper resolution of this case.

Before 1970 the District of Columbia Code defined "child" as "a person under 18 years of age." *See* 16 D.C.Code § 2301 (1967). 11 D.C.Code § 1551(a)(1) (1967), in turn, granted "original and exclusive jurisdiction" to the Juvenile Court for the trial of children as defined in 16 D.C.Code § 2301. Thus initially any person under the age of 18 was to be tried in Juvenile Court. It did not necessarily follow, however, that such a trial always took place. Under the provisions of 11 D.C.Code § 1553 (1967), the Juvenile Court was permitted to "waive" jurisdiction over a child 16 years of age or older who was charged with a felony or over any child charged with a crime punishable by death or life imprisonment. While such a waiver was to be preceded by a "full investigation," the statute on its face prescribed no standards governing the waiver determination. In practice, the "full investigation" frequently proved cursory in nature, *cf.*, *e.g.*, United States v. Howard, 146 U.S. App.D.C. 10, 449 F.2d 1086 (1971); Haziel v. United States, 131 U.S.App.D.C. 298, 404 F.2d 1275 (1968), although the procedural protections surrounding it were gradually expanded under the proddings of this court. *See, e. g.,* Watkins v. United States, 119 U.S.App.D.C. 409, 343 F.2d 278 (1964) (juvenile entitled to access to his social records during waiver proceedings); Black v. United States, 122 U.S.App.D.C. 393, 355 F.2d 104 (1965) (juvenile entitled to counsel at waiver proceedings).

Matters stood at this point when, in 1966, the Supreme Court considered the statute in its landmark *Kent* decision. The Court began its analysis by observing that the waiver decision was vitally important to the accused—that, indeed, it could potentially mean the difference between a few years confinement and a death penalty. 383 U.S. at 557, 86 S.Ct. 1045.

"* * * It is clear beyond dispute that the waiver of jurisdiction is a 'critically important' action determining vitally important statutory rights of the juvenile. * * * The Juvenile Court is vested with 'original and exclusive jurisdiction' of the child. This jurisdiction confers special rights and

---

1. In my judgment, nothing better illustrates my brethren's fundamental misunderstanding of the issues presented in this case than their failure to consider *Kent* in the body of the opinion for the court.

immunities. He is, as specified by the statute, shielded from publicity. He may be confined, but with rare exceptions he may not be jailed along with adults. He may be detained, but only until he is 21 years of age. The court is admonished by the statute to give preference to retaining the child in the custody of his parents 'unless his welfare and the safety and protection of the public can not be adequately safeguarded without . . . removal.' The child is protected against consequences of adult conviction such as the loss of civil rights, the use of adjudication against him in subsequent proceedings, and disqualification for public employment. * * * "

383 U.S. at 556–557, 86 S.Ct. at 1055.

In light of the obviously crucial nature of these rights, the Court affirmed the *Black-Watkins* requirements of access to social records and assistance of counsel during waiver proceedings. But it also held that the statute, when "read in the context of constitutional principles relating to due process and the assistance of counsel," 383 U.S. at 557, 86 S.Ct. at 1055, required more. Specifically, the juvenile was "entitled to a hearing * * and to a statement of reasons for the Juvenile Court's decision." *Ibid.* This was because "there is no place in our system of law for reaching a result of such tremendous consequences without ceremony—without hearing, without effective assistance of counsel, without a statement of reasons. It is inconceivable that a court of justice dealing with adults, with respect to a similar issue, would proceed in this manner. It would be extraordinary if society's special concern for children, as reflected in the District of Columbia's Juvenile Court Act, permitted this procedure." 383 U.S. at 554, 86 S.Ct. at 1053.

Thus during the period immediately after *Kent* juveniles were afforded a wide range of procedural rights in connection with waiver proceedings. So matters stood until 1970 when, in conjunction with sweeping legislation to reform the District of Columbia judicial system, Congress made some innocuous sounding changes in the Juvenile Court's jurisdiction. The new legislation retained the basic waiver mechanism, although the statute now explicitly provided for a hearing and a statement of reasons and established some standards to guide the judge in making the waiver decision. *See* 16 D.C.Code § 2307 (Supp. V 1972). Similarly, the new statute continued to grant "exclusive jurisdiction" to the Family Court for "proceedings in which a child, as defined in section 16–2301, is alleged to be delinquent * *." 11 D.C.Code § 1101(13) (Supp. V 1972). But whereas previously a "child" had been defined to include all persons 18 years of age or younger, the new 16 D.C. Code § 2301 excepted from the definition "an individual who is sixteen years of age or older and * * * charged by the United States Attorney with (i) murder, forcible rape, burglary in the first degree, robbery while armed, or assault with intent to commit any such offense, or (ii) an offense listed in clause (i) and any other offense properly joinable with such an offense." 16 D.C.Code § 2301 (3)(A) (Supp. V 1972).

As a moment's reflection makes clear, this so-called "definition" in fact establishes a second, parallel waiver procedure whereby a juvenile can be transferred from the Family Division to adult court. If the Government chooses, it may institute waiver proceedings in Family Court and attempt to convince the judge that under the standards enunciated in the Act the child could more appropriately be tried in adult court. It would be surprising if this procedure were much utilized in cases covered by 16 D.C.Code § 2301(3)(A), however, since under it the Government must observe the procedural rules mandated by *Kent*. Moreover, there is always the possibility that the Government will not carry its burden before the Family Court judge, in which case the waiver attempt would fail.

These risks and inconveniences can be avoided by following the second alternative. If the prosecutor simply charges

the juvenile with one of the enumerated offenses, the juvenile ceases to be a "child" under 16 D.C.Code § 2301(3)(A) and, hence, the Family Court is automatically divested of jurisdiction.[2] Thus if the prosecutor follows the second alternative the waiver decision becomes his alone, and he is permitted to make it without the encumbrance of a hearing, the requirement that he state reasons, the inconvenience of bearing the burden of proof, or the necessity of appointing counsel for the accused.

I think it obvious that this second procedure was written into the Act in order to countermand the Supreme Court's decision in *Kent* as well as this court's rulings in *Watkins* and *Black*. Indeed, the House Committee primarily responsible for drafting the provision virtually admitted as much. The Committee Report explains 16 D.C.Code § 2301(3)(A) as follows:

"Because of the great increase in the number of serious felonies committed by juveniles *and because of the substantial difficulties in transferring juvenile offenders charged with serious felonies to the jurisdiction of the adult court under present law*, provi-

sions are made in this subchapter for a better mechanism for separation of the violent youthful offender and recidivist from the rest of the juvenile community."

H.Rep. 91–907, 91st Cong., 2d Sess., at 50 (1970). (Emphasis added.) While the surface veneer of legalese which encrusts this explanation need fool no one, a simultaneous translation into ordinary English might, perhaps, prove helpful. The "substantial difficulties * * * under present law" to which the Committee coyly refers are, of course, none other than the constitutional rights explicated in the *Kent* decision. And the "better mechanism" which the Committee proposes is a system for running roughshod over those rights in a manner which is unlikely to encourage those of us still committed to constitutionalism and the rule of law.[3]

This blatant attempt to evade the force of the *Kent* decision should not be permitted to succeed. The result in *Kent* did not turn on the particular wording of the statute involved or on the particular waiver mechanism there employed. Rather, as the Court itself made clear, the rights expounded in *Kent* are funda-

---

2. I think the legislative history of 16 D.C. Code § 2301(3)(A) makes it abundantly plain that the section was intended to provide a parallel waiver procedure. *See, e. g.,* H.Rep. 91–907, 91st Cong., 2d Sess., at 50 (1970):

"Present law provides that a child age 16 and older who is charged with a felony may be transferred to adult court. Under the definitions in this bill, a person, 16 years of age or older, who is charged by the United States attorney with an enumerated violent crime is automatically subject to the jurisdiction of the adult court. However, if the United States Attorney declines to prosecute for the felony, the arresting officer will take such action as necessary to place the case within the jurisdiction of the Family Division. The case may not thereafter be transferred to the Criminal Division for adult treatment."

3. Normally, of course, it is the duty of a court to presume that Congress legislates with the Constitution in mind. *See* United States v. Rumely, 345 U.S. 41, 45, 73

S.Ct. 543, 97 L.Ed. 770 (1953). But surely there are limits beyond which this principle cannot be stretched. *Cf.* King v. Smith, 392 U.S. 309, 334–335, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968) (Mr. Justice Douglas, concurring). One can glean something of the atmosphere in which this legislation was drafted by reading the introduction to the House Committee Report:

"Your Committee is not aware of any period in the Capital's history when crime was so rampant as now, when the police have been so shackled, when prosecutors because of technicalities, and courts because of unrealistic philosophies, and failure to go full speed ahead, have contributed to a major breakdown of law enforcement, and there has been such shocking failure in large part of the machinery of justice to bring to punishment admitted murderers, rapists and others guilty of aggravated assaults and robberies. This is a crime infested city; let there be no ignoring that fact!"

H.Rep. 91–907, *supra* note 2, at 3.

mental and immutable. "The right to representation by counsel is not a formality. It is not a grudging gesture to a ritualistic requirement. It is of the essence of justice." 383 U.S. at 561, 86 S.Ct. at 1057. I must confess, therefore, that I find myself unable to approach the majority's elaborate argumentation with an entirely open mind. As one who has long believed that our Constitution prohibits abrogations of due process "whether accomplished ingeniously or ingenuously," Smith v. Texas, 311 U.S. 128, 132, 61 S.Ct. 164, 85 L.Ed. 84 (1940), I react with a good deal of skepticism to an argument which supposes that "the essence of justice" can be defeated by a juggling of the definition of juvenile or a minor modification of Family Court jurisdiction. Nonetheless, I am willing to meet the majority on its own ground, since I am convinced that when its arguments are closely examined they must inevitably fall of their own weight.

## II

I take it that my brethren and I begin our analysis of 16 D.C.Code § 2301(3)(A) with a common premise:[4] nothing in the Constitution prevents Congress from shifting the waiver decision from the Family Court judge to the United States Attorney or from establishing a supplemental waiver proceeding before the United States Attorney to complement the Family Court proceeding. There may be some decisions which are so peculiarly judicial in nature that they may not be transferred to an executive officer without running afoul of the Constitution. See Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Cf. Crowell v. Benson, 285 U.S. 22, 54–63, 52 S.Ct. 285, 76 L.Ed. 598 (1932). But, as the many cases cited by the majority demonstrate, this decision is simply not one of them. See, e. g., Ramirez v. United States, S.D. N.Y., 238 F.Supp. 763 (1965); United States v. Verra, S.D.N.Y., 203 F.Supp. 87 (1962).

It should be readily apparent, however, that this observation does little to advance the argument. The issue in this case is not *whether* the prosecutor should be permitted to make waiver decisions, but rather *how* he should go about making those decisions.[5] Put slightly differently, the question is whether the shift in decision making responsibility from the court to the prose-

---

4. I am also ready to reject, for purposes of argument at least, appellee's contention that this statutory scheme undermines the presumption of innocence and violates equal protection. Since appellee's due process claim is, in my view, sufficient to dispose of this case, I find it unnecessary to reach the more difficult equal protection and presumption of innocence arguments.

5. Once this distinction is grasped, it becomes plain that virtually every decision cited by the majority is inapposite to the issues in this case. The majority relies exclusively on cases holding that the prosecutor may constitutionally make waiver decisions, e. g., DeBacker v. Sigler, 185 Neb. 352, 175 N.W.2d 912 (1970), appeal dismissed, 403 U.S. 926, 91 S.Ct. 2258, 29 L.Ed.2d 706 (1971), or on cases holding that except in extreme situations prosecutorial discretion is not to be disturbed, e. g., Oyler v. Boles, 368 U.S. 448, 82 S. Ct. 501, 7 L.Ed.2d 446 (1962); United States v. Cox, 5 Cir., 342 F.2d 167, cert.

denied, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965). My brethren fail to cite a single case where a prosecutorial waiver decision was challenged on the ground that the prosecutor failed to follow proper procedures before making the decision. So far as I have been able to determine, there is no such case. The only possible exception to this blanket statement is Gentry v. Neil, E.D. Tenn., 310 F.Supp. 791 (1970), where a federal district judge rejected a *habeas corpus* petitioner's claim that he was entitled to a hearing before an adult court could assert jurisdiction over him. A careful reading of that case, however, makes clear that the petitioner was asserting a constitutional right to a preliminary hearing *by the juvenile court* before waiver could be effected. See 310 F.Supp. at 792. The petitioner did not challenge, and the court did not decide, the constitutional validity of the procedure used by the *prosecutor* in deciding to try the case in adult court.

cutor eliminates the need for the procedural rights expounded in *Kent*. I would, of course, answer that question "no." The transfer of the waiver decision from the neutral judge to the partisan prosecutor increases rather than diminishes the need for due process protection for the child. In answering the question "yes" the Government and the majority here rely on essentially three lines of argument. Although these contentions are interrelated, for purposes of analysis they are best addressed *seriatim*.

### A

The Government first argues that the *Kent* decision should be limited to situations in which the Government attempts to retract some pre-existing right, and that this is not such a situation. One gets a hint, I think, as to the merit of this argument from the fact that the majority barely mentions it in its otherwise eclectic defense of the statutory scheme. Nonetheless, since it is the contention chiefly relied upon by the Government and most forcefully pressed at oral argument, I think it deserves a few words of rebuttal.

As the Government reads *Kent*, its holding is restricted to cases where the Family Court has exclusive jurisdiction *ab initio* and the prosecutor attempts to wrest this jurisdiction from it. After passage of the Court Reform Act, it is argued, the Family Court is no longer vested with exclusive jurisdiction over persons between 16 and 18 who are suspected of committing serious felonies. Rather, the Government contends, this jurisdiction is now concurrent, and the United States Attorney is vested with the authority to determine the forum in which to proceed. Since there is no longer a pre-existing right to juvenile treatment, there is no longer a necessity to observe the procedural formalities

which, under *Kent*, must accompany divestiture of such a right.

Despite the superficial plausibility of this argument, I think it plainly fallacious. In the first place, I can find nothing in *Kent* which speaks to Platonic distinctions between divestiture of an existing right and failure to grant a right not already in existence. *Kent* rested, not on some fine point of metaphysics, but on the crucially important distinction between the treatment afforded children in an adult court and that granted them in Family Court. *See* 383 U.S. at 557, 86 S.Ct. 1045. Of course, that distinction is just as important whether the selection of the adult forum is spoken of as the divestiture of an existing, exclusive juvenile jurisdiction or as the initial choice of a concurrent adult jurisdiction. In either case, the consequences to the child are precisely the same and, hence, the procedural protections should be identical.

Moreover, even if one excepts the dubious vestiture-divestiture distinction as relevant, the Government's argument simply does not fit the contours of the statute. It is not true that the United States Attorney's decision to proceed in adult court negates no pre-existing right or that the Family Court lacks exclusive jurisdiction *ab initio*. In fact, the basic jurisdictional statute remains, for our purposes, unchanged since the Supreme Court's decision in *Kent*. Now, as then, the Juvenile Court is in terms granted *exclusive* jurisdiction over all children as defined in 16 D.C.Code § 2301. *Compare* 11 D.C.Code § 1551(a)(1) (1967) *with* 11 D.C.Code § 1101(13) (Supp. V 1972). True, the definition of child contained in 16 D.C.Code § 2301 has now been modified. But under the new definition, a suspected juvenile remains a child until he is charged with an enumerated offense by the United States Attorney.[6] It follows that under 11 D.

---

6. Although the Government contests this point, a careful examination of the statute leaves no doubt as to its validity. The statute begins by defining a child as "an individual who is under 18 years of

age." However, it then excepts from this definition individuals "charged by the United States attorney" with certain enumerated offenses. Obviously, a youth who has not yet been charged does not fall

C.Code § 1101 the Family Court retains exclusive jurisdiction until the United States Attorney ends the defendant's status as a child by charging him with an enumerated crime. Thus the United States Attorney's charge acts to divest the Juvenile Court of its pre-existing exclusive jurisdiction in precisely the same manner as does the juvenile judge's waiver decision.[7] Since the divestiture is the same, the procedural rights accompanying it should be the same, and we need look no farther than *Kent* to determine what those rights are.

### B

The majority wisely eschews substantial reliance on the Government's divestiture argument to distinguish *Kent*. But in its stead my brethren adopt two other arguments which, to me at least, seem equally unconvincing. First, the majority seems to contend that *Kent* is inapposite because it applied to a judicial decision, whereas 16 D.C.Code § 2301 contemplates a prosecutorial decision. Thus the majority apparently concedes, as it must, that *Kent* continues to guarantee procedural rights when the waiver is effected by a judge. *See* majority opinion at note 26. But these

rights do not attach when the same decision is made by a prosecutor, apparently because "the United States Attorney's decision * * * marks only the beginning of the process of adjudication of appellee's guilt, a process marked by the presence of all the traditional protections of procedural due process, followed by the extraordinarily liberal rehabilitation provisions of the Federal Youth Corrections Act." Majority opinion at 1338. This argument will not stand analysis.[8] The decision by a juvenile judge or by the United States Attorney to treat the child as an adult for prosecution purposes marks the beginning of precisely the same process of adjudication. And it cannot be doubted that the United States Attorney is certainly a less disinterested decision maker than the Juvenile Court judge. It would seem then that, in order to compensate for lack of neutrality, *compare* Shadwick v. City of Tampa, 407 U.S. 345, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972), *with* Coolidge v. New Hampshire, *supra*, procedural niceties should be *more* rather than less carefully observed when the prosecutor is the decision maker.

As long ago as 1935, the Supreme Court was presented with an argument

within this exception and, hence, remains a "child" until the charging decision is made.

This legislative arrangement leads, in turn, to an interesting quirk in the statute which has apparently gone unnoticed by both the Government and appellee. 16 D.C.Code § 2302(a) (Supp. V 1972) provides: "If it appears to a[n adult] court, during the pendency of a criminal charge and before the time when jeopardy would attach in the case of an adult, that a *minor defendant was a child at the time of an alleged offense*, the court shall forthwith transfer the charge against the defendant, together with all papers and documents connected therewith, to the [Family] Division." (Emphasis added.) Obviously, the defendant fits within the 16 D.C.Code § 2301 definition of a child "at the time of the alleged offense" unless *at that time* he had been charged with one of the enumerated offenses in conjunction with some unrelated proceeding. It follows that even under the majority's decision appellee may be able to

secure a 16 D.C.Code § 2302(a) transfer to the Family Division.

7. This interpretation of the statute is buttressed by the administrative practice of the D.C. police and corrections officials who, according to uncontested assertions in appellee's supplemental memoranda and affidavits, uniformly treat an arrested juvenile as a child until the U.S. Attorney divests him of that status by charging him with an enumerated offense.

8. To the extent that it is premised on the assumption that "all the traditional protections of procedural due process" compensate for the lack of an initial *Kent* hearing, the argument simply has no basis in fact. The traditional due process guarantees surrounding trial may assure a fair determination of guilt or innocence, but they do nothing to assure a fair choice between juvenile and adult procedures. That choice is made long before the trial begins in the privacy of the prosecutor's office. *See* text at pp. 1347–1349 *infra*.

that "the acts or omissions of the prosecuting attorney can [never] * * * amount either to due process of law or to a denial of due process of law." Mooney v. Holohan, 294 U.S. 103, 111–112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935). That contention was rejected in no uncertain terms. "Without attempting at this time to deal with the question at length, we deem it sufficient for the present purpose to say that we are unable to approve this narrow view of the requirement of due process. That requirement, in safeguarding the liberty of the citizen against deprivation though the action of the State, embodies the fundamental conceptions of justice which lie at the base of our civil and political institutions." 294 U.S. at 112, 55 S.Ct. at 341. In light of all that has occurred since *Mooney*—see, e. g., Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); United States v. Bryant, 142 U.S.App.D.C. 132, 439 F.2d 642 (1971); cf. Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957)—it is surprising to say the least to see resurrected the notion that conduct which has "no place in our system of law" when engaged in by a judge, Kent v. United States, *supra*, 383 U.S. at 554, 86 S.Ct. at 1053, is magically transformed into all the process which is due when engaged in by a prosecutor.

It should be clear, then, that the test for when the Constitution demands a hearing depends not on which government official makes the decision, but rather on the importance of that decision to the individual affected. "The extent to which procedural due process must be afforded * * * is influenced by the extent to which [an individual] may be 'condemned to suffer grievous loss.'" Goldberg v. Kelly, 397 U.S. 254, 262–263, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970). The test is not a precise one, and reasonable men may differ as to its application in close cases, but at least the underlying requirement is clear. "Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." Greene v. McElroy, 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959). *See also* Willner v. Committee on Character and Fitness, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963); Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 163–166, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Mr. Justice Frankfurter, concurring); Jones v. Robinson, 142 U.S.App.D.C. 221, 440 F.2d 249 (1971); Dixon v. Alabama State Board of Education, 5 Cir., 294 F.2d 150, cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L. Ed.2d 193 (1961).

All of these cases involved decision by executive, rather than judicial, officers. Yet in each case the Constitution was held to require a hearing, presumably because "the [individual's] interest in avoiding * * * loss outweigh[ed] the governmental interest in summary adjudication." Goldberg v. Kelly, *supra*, 397 U.S. at 263, 90 S.Ct. at 1018. In *Kent* the Supreme Court weighed the grievous consequences of a waiver decision against the Government's relatively meager interest in summary procedures. In the end the Court struck the balance in favor of fair procedures, and that balance is good enough for me.

The argument for why appellee should be entitled to representation by counsel at his waiver hearing is somewhat more elaborate but, in the end, no less persuasive. To the extent the contention is grounded on the Sixth Amendment right to counsel, it must be conceded that the majority's position seems to have some force. In a recent decision, a plurality of the Supreme Court has held that a right to counsel accrues only "at or after the initiation of adversary *judicial* criminal proceedings—whether by way of

formal charge, preliminary hearing, indictment, information, or arraignment." Kirby v. Illinois, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). (Emphasis added.)[9] Hence, even though *Kent* held the waiver determination to be a "critically important" stage of the prosecution when made by a judge, *cf.* Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), Sixth Amendment rights may not attach if the decision is made by a nonjudicial officer at a precharge stage of the proceedings. *Compare* Kirby v. Illinois, *supra, with* United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). *But cf.* Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

If that were the end of the matter, *Kirby* might pose a significant obstacle to an extension of the *Kent* counsel requirement to prosecutorial waivers.[10] But it must be remembered that *Kent* was not solely, or even primarily, a Sixth Amendment decision. As argued above, *Kent's* requirement of a hearing and a statement of reasons was premised on the Fifth Amendment guarantee of procedural due process, a guarantee which has nothing to do with "critical stages," or with judicial as opposed to prosecutorial decision making.[11]

Once the right to a hearing is established, it follows, I think, that appellee also has a right to counsel—not because the Sixth Amendment requires it, but because it is necessary to protect Fifth Amendment rights. Thus, in retrospect at least, it seems clear that there is no Sixth Amendment right to counsel during the precharge custodial interrogation discussed in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Yet a lawyer was required nonetheless "not to vindicate the constitutional right to counsel as such, but * * * 'to guarantee full effectuation of the privilege against selfincrimination. . . .'" Kirby v. Illinois, *supra,* 406 U.S. at 689, 92 S.Ct. at 1882, quoting Johnson v. New Jersey, 384 U.S. 719, 729, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Similarly, it could not conceivably be argued that Sixth Amendment rights attach to welfare termination proceedings, which are not even criminal in nature. Yet the Supreme Court held

9. In fact, only 4 Justices joined the opinion containing the language quoted in text. Four other Justices thought that the principles announced in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), governed "critical" confrontations between the defendant and the government even if they occurred at a pretrial stage. *See* Kirby v. Illinois, 406 U.S. 682, 689–705, 92 S.Ct. 1877, 1882–1890 (1972). The deciding vote was cast by Mr. Justice Powell, who concurred in the result only with the cryptic comment that he "would not extend the *Wade-Gilbert per se* exclusionary rule." 406 U.S. at 691, 92 S.Ct. at 1883. Justice Powell's opinion is, of course, subject to a variety of interpretations. However, his refusal to join the plurality opinion might be taken as an indication that, although he believes there is a precharge substantive right to counsel, he "would not extend the * * * *per se* exclusionary rule." *Ibid. Cf.* Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). On this reading of the opinion, there are 5 votes on the Court for a precharge right to counsel at critical stages, although only 4 are for an extension of the *Wade-Gilbert* exclusionary rule to this situation. Since the waiver decision was held a "critically important" stage in *Kent, see* 383 U.S. at 556, 86 S.Ct. 1045, and since it involves the exclusion of no evidence, *Kirby* arguably does not preclude a 6th Amendment right to counsel at a prosecutorial waiver proceeding. However, I find it unnecessary to reach a final judgment as to Justice Powell's meaning since in my view there are independent non-6th Amendment grounds for requiring counsel at prosecutorial waiver proceedings. *See* text at pp. 1346–1348 *infra.*

10. *But see* note 9 *supra.*

11. Indeed, *Kirby* itself makes abundantly clear that, although the counsel requirement of *Wade* and *Gilbert* does not apply to precharge lineups, the *Wade-Gilbert* due process standards are fully effective at this stage. See 406 U.S. at 690, 92 S.Ct. at 1883. *See also* Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

that there was a right to counsel nonetheless because counsel was necessary to "help delineate the issues, present the factual contentions in an orderly manner, conduct cross-examination, and generally safeguard the interests of the recipient." Goldberg v. Kelly, *supra*, 397 U.S. at 270–271, 90 S.Ct. at 1022.[12]

I think all the arguments which influenced the Court to require counsel in *Goldberg* and *Miranda* are fully applicable here. "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel," Powell v. Alabama, 287 U.S. 45, 68–69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932), and nowhere is this more true than when the individual presenting his case is a frightened juvenile confronted with the sometimes impersonal machinery of justice.

*Congress itself seems to have realized that a waiver hearing would be a mockery without the presence of counsel.* 16 D. C.Code § 2304 (Supp. V 1972) provides: "A child alleged to be delinquent or in need of supervision is entitled to be represented by counsel at all critical stages of [Family] Division proceedings \* \* \*." The Senate Committee explained this provision as follows:

> "The proposed section guarantees representation at 'all critical stages' of the proceedings, the concept used in Miranda v. Arizona, 384 U.S. 436 (1966). \* \* \* Further detail is left to the courts, and the statute is cast in terms which will absorb future court decisions without necessitating statutory change."

S.Rep. 91–620, 91st Cong., 1st Sess., at 16 (1969). The citation to *Miranda* indicates that Congress did not use the term "critical stages" in its Sixth Amendment sense since, as argued above, *Miranda* was not a Sixth Amendment decision. Rather, Congress seems to have intended that counsel be provided the juvenile at all stages where critically important decisions affecting his case are made. *Kent* held that waiver proceedings are such a stage, and Congress was aware of the *Kent* decision when 16 D.C.Code § 2304 was drafted. I would therefore hold that counsel is required under statutory as well as constitutional compulsion.

C

Finally, the Government argues that extension of *Kent* to prosecutorial waivers would abrogate the ancient doctrine of prosecutorial discretion. It is, of course, still widely believed that prosecutors have a broad, unreviewable discretion to determine which offenders to charge and what crimes to charge them with, although even this notion is now widely challenged by the leading scholars. *See, e. g.,* K. Davis, Discretionary Justice 188–214 (1969). But it should be readily apparent that usual notions of prosecutorial discretion have nothing to do with this case. The defendant does not ask us to review the substance of the prosecutor's charging decision or to place limits on the scope of his discretion. Bland directs his complaint to the *procedures* the prosecutor uses rather than to the *merits* of the decision ultimately reached. Reference to the Supreme Court's decision in *Kent* is again instructive. The *Kent* majority recognized that "the Juvenile Court should have considerable latitude within which to determine whether it should retain jurisdiction over a child" and that the court had "a substantial degree of discretion as to the factual considerations to be evaluated, the weight to be given them and the conclusion to be reached." 383 U.S. at 552–553, 86 S.Ct. at 1053. But, the Court continued, this admittedly broad discretion did not give the judge "a license for arbitrary procedure."

---

12. True, the Supreme Court did not hold that counsel must be *provided* to indigent recipients at the pre-termination stage. But this was apparently because "the statutory [post-termination] 'fair hearing' will provide the recipient with a full administrative review." Goldberg v. Kelly, 397 U.S. 254, 266–267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970).

*Ibid.* Similarly, I think it plain here that the prosecutor's broad authority to choose between juvenile and criminal procedures provides no argument for the power to exercise that authority in a manner which does not comport with procedural due process.

The majority's opinion suggests reliance on a broad appeal to prosecutorial discretion, but ultimately comes to rest on the more specialized argument that the prosecutor has unreviewable discretion as to whether or not to grant a hearing. As should be readily apparent, this formulation merely assumes the answer to the very question before us for decision. The assumption is made, moreover, on the basis of flimsy evidence and a fallacious analogy.

My brothers point to "the significance of a variety of other common prosecutorial decisions, *e. g.*, whether to charge one person but not another possible co-defendant; whether to charge an individual with a misdemeanor or a felony; etc. * * * Grave consequences have always flowed from this, but never has a hearing been required." Majority opinion at 1335. With all respect, one could just as easily infer from the lack of authority provided to support this proposition that never has a hearing been *requested.* But even if one assumes, *arguendo*, that a hearing is not necessary in these situations, it hardly follows that a child may be summarily deprived of his right to juvenile treatment without being heard. As the majority itself indicates, there are dramatically real differences between run-of-the-mill charging decisions and prosecutorial waiver of Family Court jurisdiction. A normal charging decision is "only the beginning of the process of adjudication of [defendant's] guilt, a process marked by the presence of all the traditional protections of procedural due process * * *." Majority opinion at 1338. A defendant has the opportunity to show that he was improperly charged—that is, that he is not guilty—at the preliminary hearing, at the trial itself, and, if necessary, on appeal.

In contrast, the waiver decision marks not only the beginning but also the end of adjudication as to the child's suitability for juvenile treatment. It is well established that, barring equal protection problems, a guilty person has no right not to be charged with a criminal offense. *See, e. g.*, Oyler v. Boles, 368 U. S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); Washington v. United States, 130 U.S.App.D.C. 374, 401 F.2d 915 (1968). *But cf.* Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). But a "guilty" child may, under certain circumstances, have a right to be charged as a juvenile. *See, e. g.*, United States v. Howard, *supra*; Kent v. United States, 130 U.S.App.D.C. 343, 401 F.2d 408 (1968). The question of juvenile treatment turns not on the issue of guilt, but on such factors as the maturity of the child and his susceptibility to rehabilitation. *See* Haziel v. United States, *supra*. These factors, unlike the question of guilt, drop out of the case once the initial waiver decision is made. Hence it is especially vital that the procedures be fair at the one point in the criminal process where these matters are considered. The very fact that the prosecutor's decision is largely unreviewable and therefore final argues for, rather than against, making certain that he has all the facts before him when he exercises his great responsibility.

Nor is the majority on firm ground when it compares prosecutorial waiver to the decision "whether to charge an individual with a misdemeanor or a felony [which] has long determined the court in which that person will be tried." Majority opinion at 1335. It trivializes the juvenile court system to suggest that it represents merely an alternative forum for the trial of criminal offenses. The Family Court is more than just another judicial body; it is another system of justice with different procedures, a different penalty structure, and a different philosophy of rehabilitation. *See* McKeiver v. Pennsylvania, 403 U.S. 528, 550–551, 91 S.Ct. 1976, 29 L.Ed.2d 647

(1971); Kent v. United States, *supra*, 383 U.S. at 557, 86 S.Ct. 1045. We play a cruel joke on our children by arguing that the juvenile system is a nonadversary, noncriminal, beneficent instrument of rehabilitation when determining whether criminal procedures are to be required at trial, *see* McKeiver v. Pennsylvania, *supra*, while at the same time maintaining that it is just another criminal court when determining the procedures which must accompany waiver.

### III

It will not do to minimize or ignore the consequences of the decision reached today. The majority suggests that youths tried in adult court will still receive a measure of protection, since conviction may be "followed by the extraordinarily liberal rehabilitation provisions of the Federal Youth Corrections Act." Majority opinion at 1338. There is, however, more than a touch of irony in this suggestion. A similar point was made by District Judge Gesell in upholding 16 D.C.Code § 2301 in an unrelated case: "It should be noted that * * * in the event of convictions the extraordinarily flexible provisions of the Federal Youth Correction [*sic*] Act designed to create programs for limited incarceration and effective rehabilitation are completely available." United States v. Alexander, D.D.C., 333 F.Supp. 1213, 1217 (1971). Yet Judge Gesell has also found that large numbers of eligible youths are being denied Youth Corrections Act treatment precisely because there presently are no youth facilities available, and that "[t]he pressures from overcrowding [have resulted] in a complete frustration of the Youth Corrections Act program." United States v. Alsbrook, D.D.C., 336 F.Supp. 973, 976, 977 (1971).

Thus I do not think we can escape the fact that after our decision today there will be many impressionable 16- and 17-year-olds who will be packed off to adult prisons where they will serve their time with hardened criminals. These children will be sentenced, moreover, without any meaningful inquiry into the possibility of rehabilitation through humane juvenile disposition. Sometimes I think our treatment of these hapless "criminals" is dictated by the age-old principle "out of sight—out of mind." Yet there is no denying the fact that we cannot write these children off forever. Some day they will grow up and at some point they will have to be freed from incarceration. We will inevitably hear from the Blands and Kents again, and the kind of society we have in the years to come will in no small measure depend upon our treatment of them now.

Perhaps I should add that I harbor no illusions as to the efficacy of our juvenile court system. I share Mr. Justice Fortas' view that "the highest motives and most enlightened impulses [have] led to a peculiar system for juveniles, unknown to our law in any comparable context. The constitutional and theoretical basis for this peculiar system is—to say the least—debatable. And in practice * * * the results have not been entirely satisfactory." In re Gault, 387 U.S. 1, 17–18, 87 S.Ct. 1428, 1438, 18 L. Ed.2d 527 (1967). Nor do I believe that a fair and constitutional waiver system would rescue from the clutches of adult punishment every juvenile capable of rehabilitation in a more beneficent environment. As Chief Judge Bazelon has pointed out, "The job of saving the boy who has compiled a long juvenile record and then committed a serious offense after his sixteenth birthday may be so costly, or so difficult even if no cost were spared, that the [waiver procedures] required by statute cannot but be a pious charade in many cases." Haziel v. United States, *supra*, 131 U.S. App.D.C. at 303, 404 F.2d at 1280.

I must admit, then, to considerable uncertainty as to the ultimately proper disposition of a case such as Bland's, given our scarce societal resources, our limited knowledge of juvenile corrections, and the intractable nature of the root problems of poverty and social disintegration. I am certain of a few propositions, however. I am confident that a

child is unlikely to succeed in the long, difficult process of rehabilitation when his teachers during his confinement are adult criminals. I am sure that playing fast and loose with fundamental rights will never buy us "law and order": constitutional rights for children won in *Kent*, like other constitutional rights, are protected from "sophisticated as well as simple-minded" modes of revision or repeal. Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 83 L.Ed. 1281 (1939). And I am convinced that the beginning of wisdom in this area, as in so many others, is a respect and concern for the individual—the kind of respect and concern which the due process clause guarantees. I would therefore hold that Congress may not abrogate a child's constitutional rights to a hearing, representation by counsel and a statement of reasons before he is charged and tried as an adult.

I must respectfully dissent.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

### ORDER

PER CURIAM.

On consideration of appellee's suggestion for rehearing *en banc*, it is

Ordered by the court, *en banc*, that appellee's aforesaid suggestion for rehearing *en banc* is denied.*

A separate statement of Circuit Judges McGOWAN and LEVENTHAL, as to

why they voted to deny rehearing *en banc* is attached.

A separate statement of Circuit Judge J. SKELLY WRIGHT, in which Chief Judge BAZELON and Circuit Judge SPOTTSWOOD W. ROBINSON, III, join, as to why he voted to grant rehearing *en banc* is attached.

A separate statement of Chief Judge BAZELON as to why he voted to grant rehearing *en banc* is attached.

A separate statement of Circuit Judge WILKEY, in which Circuit Judge TAMM concurs, as to why he voted to deny rehearing *en banc* is attached.

### Statement of McGOWAN and LEVENTHAL, Circuit Judges, as to Why They Voted to Deny Rehearing *En Banc*

Our vote to deny rehearing *en banc* is not to be taken as implying agreement with the opinion of the panel. It rather takes into account the condition of our docket—in which we now have for consideration review of actions of the District Court taken before its jurisdiction was curtailed August 1, 1972. More important, it takes into account the constitutional nature of the question, as one calling ultimately for resolution by the Supreme Court which has previously heard argument on a closely related matter.[1] This conclusion is reinforced by the divergence between the approach of the panel of this court and the approach of the Fourth Circuit. Cox v. United States, September 12, 1972, Fourth Circuit, No. 71–1384 (pertaining to the Federal Juvenile Delinquency Act.[2] The

---

* The court notes that Count 1 of the indictment is based on 18 U.S.C. § 2114 (1970). No issue has been raised in the District Court or in this court as to the possible applicability of 18 U.S.C. § 5032 (1970) with respect to this count. Assuming the issue may be raised when this case returns to the District Court, we do not decide it now.

1. The Supreme Court noted probable jurisdiction on an appeal that raised as one issue, *see* 37 L.W. 3301, whether the Nebraska Juvenile Act denied due process by its conferral upon a prosecutor of an

unreviewable discretion whether to proceed in juvenile court or under the Criminal Code, De Backer v. Brainard, 393 U.S. 1076, 89 S.Ct. 856, 21 L.Ed.2d 770 (1968). The appeal was later dismissed, in view of the petitioner's failure to raise the issue timely. De Backer v. Brainard, 396 U.S. 28, 90 S.Ct. 163, 24 L.Ed.2d 148 (1969).

2. After the filing of this Statement, the panel opinion has been vacated and displaced by the Fourth Circuit's *en banc* opinion. *See* 473 F.2d 334 (1973).

question being ripe for authoritative determination, we think the interest of administration is best served by avoiding the delay attendant upon *en banc* consideration by this court.

Statement of Circuit Judge J. SKELLY WRIGHT, in Which Chief Judge BAZELON and Circuit Judge SPOTTSWOOD W. ROBINSON, III Join, as to Why He Voted to Grant Rehearing *En Banc*

I would grant the request for rehearing *en banc* in this case for the reasons stated in my dissent to the panel opinion.

The recent prisoners' riot at the District of Columbia Jail, during which the District of Columbia Superintendent of Corrections and 11 guards were held hostage for several hours, tragically demonstrates the inhumanity as well as the danger of treating children as adults for purposes of correction and rehabilitation. Apparently one of the causes of the prison riot was the homosexual assaults by the adult prisoners on the 16- and 17-year-old children being held in the jail as "adult" prisoners.[1] The importance of this issue with respect to the riot is reflected in the order of the District Judge who held a night hearing on prisoner complaints while the Corrections personnel were still being held hostage. One of the rioters' demands was that the children be segregated at the jail to protect them from the other inmates. The District Judge in his order granted that demand.[2]

Statement of BAZELON, Chief Judge, as to Why He Voted to Grant Rehearing *En Banc*

I agree with Judge Wright that the full court should review the panel's decision construing 16 D.C.Code § 2301 (Supp.1972). In addition, I am disturbed by the action of the court today for another reason.

We have before us an order of a District Judge dismissing an indictment that charges violation of both federal and local District of Columbia law. The federal offense, 18 U.S.C. § 2114 (1970), was the first count of the indictment and carries a mandatory sentence of twenty-

---

1. The following colloquy between the judge and one of the spokesmen for the rioters appears at pp. 36 to 39 of the transcript of the hearing in Campbell et al. v. Rodgers et al., D.D.C., Civil Action No. 1462–72, Oct. 11, 1972:

 MR. BROWN: So the alternative is to ruin them for life?

 THE COURT: You do not have any argument with me about 16 year olders over there. You do not have to talk to me about that. But the point is there may be something that very well can be done about housing them at the D.C. Jail, because that has been the complaint registered by two or three of you already. And it might very well be that the attention of the community is called to that single factor. I don't discount that at all. But what can be done about that, I just do not know.

 \* \* \* \* \*

 MR. BROWN: \* \* \*
 When this thing came up last night, we didn't want nobody to molest these little kids. He could speak up and say, "Man, I don't want to do that," then we are ready to die for this little brother. We are tired of these people putting us in the condition so they make us rape one another, they make us rape one another, and we are getting tired of this.

2. The District Judge stated from the bench his reasons for his order:

 To the extent of what I can do in this situation, it is very limited. The presence of a 16 and 17 year old in that jail population is obviously a condition which is a hazard not only for the inmates but for the security of the jail. There is no question about that. Because this is so, and on the basis of what I have heard here this evening, that is the one thing I can do and that is the one thing I am going to do.

 Campbell et al. v. Rodgers et al., *supra* note 4, Tr. at 52.

five years imprisonment.[1] The Federal Juvenile Delinquency Act provides:

> A juvenile alleged to have committed one or more acts in violation of a law of the United States not punishable by death or life imprisonment, and not surrendered to the authorities of a state, shall be proceeded against as a juvenile delinquent if he consents to such procedure, unless the Attorney General, in his discretion, has expressly directed otherwise.[2]

This record contains no indication that the Attorney General has been consulted, either before or after the indictment.

Regrettably, neither the parties in the District Court, the District Judge, the parties on the original appeal, the original panel of the Court of Appeals, nor the parties on the petition for rehearing and suggestion for rehearing *en banc* acknowledged the presence of the federal offense. This "oversight" is not corrected even today. Rather the form of the court's denial of rehearing *en banc* merely acknowledges the problem, thus leaving in doubt the effect of the panel's remand "for trial." United States v. Bland, 153 U.S.App.D.C. at ——, 472 F.2d at 1338 (1972).

Assuming, however, that the court's footnote is sufficient to cause the District Judge to consider the applicability of 18 U.S.C. § 5032 (1970), I am still unable to understand why this court chooses to avoid that issue. The record before us contains all of the facts necessary to a decision: appellee is within the age limits established by the Juvenile Delinquency Act, he was indicted under the federal statute, and the Government has shown nothing to indicate compliance with section 5032. Arguably, we have two issues before us, but each is purely a question of law and each is essential to the jurisdiction of the District Court.

The first question is whether and how the Government must comply with section 5032, and whether a federal court can or must review the nature of that compliance. *Compare* Cox v. United States, 473 F.2d 334 (4th Cir. 1973) (*en banc*), *with* Cox v. United States, No. 71-1384 (4th Cir., unpublished opinion issued Sept. 12, 1972), *reprinted at* 473 F.2d 338. The second question is whether Congress intended 16 D.C.Code § 2301 (Supp. 1972) to repeal in part the requirements of 18 U.S.C. § 5032 (1970), and, if it did so intend, whether that action is permitted by the Constitution. *See* United States v. Thompson, 147 U.S. App.D.C. 1, 452 F.2d 1333 (1970).[3]

---

1. The indictment specified an *armed* robbery. For a first offender not armed, the sentence is ten years. *See* 18 U.S.C. § 2114 (1970).

2. 18 U.S.C. § 5032 (1970). The remainder of that section states:
 In such event the juvenile shall be proceeded against by information and no criminal prosecution shall be instituted for the alleged violation.

3. Judge Wilkey today suggests that § 5032 would not apply when an individual charged with a federal offense is also charged with a local offense listed in § 2301. This result, he says, is not barred by United States v. Thompson because such an individual's status "is *different* from [that of an individual who is] charged elsewhere with the federal crime [alone]" (emphasis altered).

 Under *Thompson's* equal protection analysis, "discriminatory classifications affecting District residents must be subjected to the strictest possible review," and the justifications for such classifications must be "convincing," not "merely rational or even plausible." Judge Wilkey does not undertake an equal protection analysis of the "different" status he perceives. He does not state how the interests of the individual become less weighty, how the interests of the Government become more weighty, or why such interests could not be served by use of less discriminatory means.

The court is concerned about the confusion in the District Court that will result from our delay in settling the local law. I respectfully submit that leaving the matter to the Supreme Court settles nothing. It simply increases the confusion in proportion to the delay that will precede a decision by that tribunal. Further, it seems to me that this court shoud be equally, if not more, concerned with the confusion in the federal law—which this very case shows to be of the first magnitude. The answer is not to leave everything in abeyance, but to take up this case en banc, assign it first priority, and settle both areas immediately.

Statement of WILKEY, Circuit Judge, as to Why He Voted to Deny Rehearing *En Banc,* in which Circuit Judge TAMM concurs.

In light of Chief Judge Bazelon's statement that he has discovered "a new issue" of the "first magnitude" that creates "confusion in the federal law" and

requires that we rehear the case *en banc,* some response on behalf of the panel that decided this case seems called for.[1] With all due respect, I must say that this "new issue" appears to me to be unimportant for the decision in *this* case, is not confusing, and would be a most inappropriate subject for reconsideration *en banc,* although we have left it for such attention as the parties and the District Court wish to give it on remand.

I.

In order to place this controversy in perspective it is necessary to understand the nature of the problem so recently discovered by Chief Judge Bazelon. His position is, I believe, as follows:

(1) The defendant, Bland, was charged in the indictment with violating two statutes—a local D.C. statute prohibiting armed robbery and a federal statute prohibiting the robbery of a person having charge of the United States mail.

Such an analysis might well demonstrate that the "difference" Judge Wilkey perceives demands *more,* not less, protection for the individual charged with multiple offenses by virtue of his presence in the District. He is subjected to potentially greater consequences. With *Bland* as the law, he has nothing between him and prosecution on all counts as an adult except the safeguards of § 5032, while a defendant elsewhere may have state-provided procedural guarantees. The Government, on the other hand, not only has no additional *reason for avoiding* § 5032, it actually gains an advantage in the District that it lacks elsewhere, because it is permitted to consolidate the trials.

It has been suggested that local offenses covered by § 2301 are somehow "worse" than federal offenses such as interstate transportation of a stolen vehicle. *See* 472 F.2d 1356 (D.C.Cir. 1972) (West Publishing Co., Advance Sheet, Part 3, April 9, 1973) (Statement of Wilkey, Circuit Judge, as to Why He Voted to Deny Rehearing En Banc, in which Circuit Judge Tamm Concurs). But a countervailing list of "horribles" that constitute federal violations is quite easy to produce. Indeed, *Bland* involves one

example: the local robbery charge is a lesser included offense to the federal crime. The Government's special needs cannot lie in that distinction.

Finally, the absurdities Judge Wilkey fears would result from dual juvenile and adult jurisdiction are not attributable to § 5032. They exist in a multitude of other sentencing situations, and the trial judges may solve them as readily in the situation Judge Wilkey hypothesizes as they have in others, such as where an individual in some form of conditional release commits another crime, or where detainers are lodged, or even where sentencing alternatives are mutually exclusive. *See* United States v. Waters, 141 U.S.App.D.C. 289, 437 F.2d 722 (1970).

1. Judge Ronald N. Davies, United States Senior District Judge for the District of North Dakota, was a member of the panel that originally decided this case. Since only "circuit judges who are in regular active service" may participate in voting on rehearings *en banc,* Judge Davies did not participate in the vote or statement of views on whether to rehear this case *en banc.* Fed.R.App.P. 35.

(2) The decision to prosecute an individual as a juvenile under the federal statute is controlled by 18 U.S.C. § 5032 (1970), while the decision whether a youth will be prosecuted as a juvenile under the D.C. statute is controlled by 16 D.C.Code § 2301 (1972).

(3) The court erred in failing to consider whether the federal statute permitted Bland to be tried as an adult.

### A.

The federal statute can only be relevant to this controversy if it is determined that either (1) *both* the federal and the D.C. statutes regarding the determination of juvenile status must be simultaneously applicable to the defendant, *or* (2) the federal statute in some way supersedes the D.C. statute and is the *sole* criterion for determining whether Bland must be tried as a juvenile. If the federal statute neither supersedes nor acts concurrently with the D.C. provision, then the federal provision is not relevant to this case and this court did not err in failing to consider the federal provision. It is my belief that Congress clearly intended the D.C.Code provision to be the sole basis for determining a defendant's status in situations such as this.

The idea that *both* statutes could be intended to apply to an individual in a single trial is patently absurd. It conjures up the vision of a defendant in the same trial being sentenced on two charges—5 years in the D.C. prison under a D.C. statute violation and a term in the federal juvenile center for the federal statute—*the sentences to run concurrently*. In the same trial for the same criminal act the defendant must be treated as either an adult or child for all purposes, even though the acts committed constitute violations of both federal and D.C. codes.

The language of the D.C.Code provision clearly states that it is to be the sole applicable basis for determining a defendant's status in situations such as this. The provisions of 16 D.C.Code § 2301(3) by their own terms are *not limited to* situations in which the defendant is charged with the violation of a *local* D.C. provision.

The D.C.Code states as follows:

(3) The term "child" means an individual who is under 18 years of age, except that the term "child" does not include an individual who is sixteen years of age or older and—

(A) charged by the United States attorney with (i) murder, forcible rape, burglary in the first degree, *robbery while armed,* or assault with intent to commit any such offense, *or (ii) an offense listed in clause (i) and any other offense properly joinable with such an offense* . . . .

It is clear and undeniable that the statute's application is not limited to situations in which a defendant is charged only with committing one of the offenses enumerated in clause (i) of the subparagraph. The statute in clause (ii) also dictates that a person between 16 and 18 will be treated as an adult when he is charged with "*any* other offense properly joinable with such an offense" as is listed in clause (i). *The clear purpose of clause (ii)* is to assure that the scheme for determining juvenile status will remain applicable in a particular trial, even if the defendant is simultaneously charged with an offense that is greater or lesser than or different from the offenses enumerated in clause (i).

This extension of applicability under clause (ii) is not limited to situations in which the alternative offense arises under local law. The extension applies to "*any* other offense" whether it is "greater," "lesser," or proceeds on an entirely different theoretical basis. "Any other offense" would clearly include the violation of a federal statute. The only issue

would be whether the alleged federal violation was properly joinable with one of the crimes listed in clause (i); the propriety of the joinder here cannot be seriously contested and certainly has not been.

The D.C. statute is much more explicit than the U.S.Code enactment and provides for specific circumstances under which a defendant will or will not be treated as an adult. Likewise, the D.C. Code provision was passed *long after* the passage of the federal statute. The D.C. provision should, therefore, be considered to be 'Congress' ultimate decision regarding when and under what circumstances a person would be treated as an adult in the District of Columbia.

While it sometimes occurs that what all have perceived as true is, in one flash of individual brilliant insight, revealed to be false, this is not frequent in carefully researched and vigorously contested cases. What all involved in *Bland*—able counsel (including a principal drafter of the statute construed), the court of three judges, including one vigorous dissenter on the recognized principal issues, counsel on petition for rehearing—had treated as clear beyond cavil, is now found by Chief Judge Bazelon to be confused and obscure. I submit that the previous interpretation by all concerned was no "oversight," but simply the way reasonably intelligent lawyers and judges were intended by Congress to read the two statutes, and so we did.

2. 147 U.S.App.D.C. 1, 452 F.2d 1333 (1971).

3. In *Thompson* the defendant was found to have violated 21 U.S.C. § 174 and 26 U.S.C. § 4704(a). Despite the fact that he was charged solely with violations of federal statutes, defendant was denied bail under a provision of the District of Columbia Court Reform and Criminal Procedure Act of 1970. 23 D.C.Code §

B.

Judge Bazelon's statement intimates that even if Congress intended the D.C. Code to be solely applicable, this might be unconstitutional under our decision in United States v. Thompson.[2] The basis for the holding in *Thompson*, however, is easily distinguished from the situation here. Indeed, to hold Congress' action here unconstitutional would be tantamount to saying that Congress could not pass special legislation dealing only with the problems of the District of Columbia, and Judge Bazelon's footnote 3 verges on saying just that.

In *Thompson* the defendant was charged solely with violating a federal statute. Thus, his status was no different from any other person charged with violating the same statute anywhere else in this country. Because Thompson was before a court in the District of Columbia, however, the District Court applied a local statute that caused him to be treated substantially differently from what he would have been had he been before any other U.S. District Court anywhere else in the nation.[3]

In this case Bland is not being treated differently under the federal criminal statute merely because he is before a court in the District of Columbia; Bland is treated differently here because his status *is* different from one charged elsewhere with the federal crime. He is being simultaneously tried for both a local and a federal crime in the same court; this condition could only exist in the District-

1325(c) (Supp. IV, 1971). Had the defendant been similarly charged anywhere else in this country, his eligibility for post-conviction release would have been determined under 18 U.S.C. § 3148 (1970). The court held that it would be unconstitutional to determine defendant's eligibility for bail under the local statute and held, therefore, that Congress could not have intended for the local statute to apply in such a situation.

trict of Columbia. Congress, acting in its capacity as a state legislature, has determined that when this status exists the defendant shall be treated in this particular way.

Merely because Bland's status is unique to the District of Columbia and could not occur anywhere else in the country does not mean that Congress cannot act to meet the situation. Indeed, this unique status is the basis for Congress' unique response. If Bland were charged *only* with committing the federal crime, then the D.C.Code provision would not apply at all, and Bland's status would be determined under federal law, as anywhere else in the nation.[4] Thus the D.C. provision is very carefully drawn to cover a situation that could exist in the District of Columbia, and by its own terms does not treat differently a defendant whose status is the same as one before a District Court elsewhere.

## II.

In closing, I would briefly call attention to the Fourth Circuit's recent *en banc* decision in Cox v. United States.[5] While *Cox* and the instant case involve different statutes, the Fourth Circuit's opinion by Chief Judge Haynsworth is helpful here.

Under 18 U.S.C. § 5032 (1970) a juvenile outside the District of Columbia charged with a federal offense, not punishable by death or life imprisonment, shall be prosecuted as a juvenile delinquent, if he consents to that procedure, unless the Attorney General has expressly directed that he be prosecuted as an adult. Thus, outside the District of Columbia, the Attorney General, in an exercise of his prosecutorial discretion, determines whether a youth will be treated as an adult or a juvenile.

In *Cox* the Fourth Circuit rejected the argument that a youth has a constitutional right to representation and a hearing before the Attorney General could

direct that he be proceeded against as an adult. In so doing, the majority made the following statement:

> The only proper question here, therefore, is whether the general statutory scheme is constitutional, *whether Congress reasonably might vest* in the Attorney General, rather than in a judge in a judicial proceeding, the responsibility of deciding whether or not to prosecute a juvenile as an adult. That question is appropriately answered affirmatively.[6]

From this language it is clear that the Fourth Circuit felt that whether a youth is treated as an adult or as a juvenile is a matter originally within the discretion of Congress, which it may delegate to another or determine itself. Precisely as in 18 U.S.C. § 5032, upheld by the Fourth Circuit, Congress has simply exercised its inherent power to provide for the determination of the issue of adult or juvenile status.

---

5. 473 F.2d 334 (4th Cir. 1973) *(en banc)*.

6. Id. at 336 (emphasis added).